## New York Life Insurance Company v. Charles W. Rilling.
### Gen. No. 11,964.

1. INSURANCE AGENT—*when entitled to commissions.* Where an insurance agent during his employment by a company has obtained an application for a particular amount of insurance, he is entitled to his commission, notwithstanding after his resignation the form of policies applied for are changed, where it appears that such agent was the procuring cause for the placing of such insurance.

2. INSURANCE AGENT—*when not entitled to commissions.* Where an agent of an insurance company, employed on a commission basis, procures an application for insurance and subsequently another agent of the company induces the applicant to increase the amount of the application, the former agent is not entitled to his commission on the additional insurance thus procured.

3. REMARKS OF COUNSEL—*when, not ground for reversal.* The remarks of counsel made to a witness in the presence of the jury, to the effect that he had no regard for an oath, *held,* not ground for reversal where objection thereto was sustained and the court instructed the jury to disregard all remarks of counsel.

Action of assumpsit. Appeal from the Circuit Court of Cook County; the Hon. LOCKWOOD HONORE, Judge, presiding. Heard in this court at the October term, 1904. Affirmed upon *remittitur.* Opinion filed June 15, 1905. *Remittitur* filed and judgment affirmed June 19, 1905.

**Statement by the Court.** The appellee sued appellant in assumpsit for commissions which he claimed to be due him as a solicitor for insurance on the life of George P. Braun, and recovered judgment for the sum of $5,684.10. Appellee, at the time of the transactions hereafter mentioned, had been engaged as a solicitor for life insurance for a number of years, and had been in the employ of Mutual Life Insurance Company during all the time he was such solicitor, except three or four months. He became acquainted with George P. Braun in the year 1890, and in the year 1900 solicited him to apply for insurance on his life, with the result that he procured from Mr. Braun an application to the Mutual Life Insurance Company, of New York, which that company declined, after which appellee brought the notice of Mr. S. M. Pearman, who at that time was agents' director of appellant at appellant's branch office

in Chicago, to Mr. Braun's desire for insurance. Mr. Pear-
man testified that, by appellee's request, he called on Mr. W.
B. Carlile, the manager of the Chicago agency of the Mutual
Life Insurance Company of New York, and stated to him,
as Pearman testified, that Rilling had told him that he, Mr.
Carlile, would furnish him with all the data of the history
of the Mutual Life with the Braun application, and show to
him Braun's correspondence with the company, and that
Carlile said that was correct and that Rilling was very much
disappointed that the Mutual Life did not issue the policy
applied for, that he expected the commissions and the com-
pany expected to wipe out some indebtedness of Rilling from
the commissions, and that he, Carlile, would appreciate any
interest Pearman would take in the matter on Rilling's be-
half, as it would do him and the Mutual Company a good
turn, and Pearman told Carlile that he was interested in a
$100,000 application, and would do all he could to get the
case through, and would fully protect Rilling by giving him
a contract. Mr. Carlile testified that Mr. Pearman said he
wanted the information so that he could protect Rilling's
rights with his company, and I said he controlled the busi-
ness for the Mutual Life, and that it was with my knowl-
edge that he was taking the Braun policy to be issued for
$100,000 to the New York Life. Pearman said he would
shut out any other agent for all time, after Rilling signed
his name to the bottom of the application. Mr. Pearman
denied positiely having said that he would protect Rill-
ing for all time, or words to that effect. Mr. Pearman
then returned to his office and a contract was executed be-
tween the appellant and Rilling. The contract is dated July
16, 1902. By it Rilling is appointed agent for appellant,
"for the purpose of canvassing for applications for insur-
ance on the lives of individuals, and of performing such
other duties in connection therewith as may be required by
the officers of said party of the first part," etc. The con-
tract contains numerous provisions, among which are pro-
visions fixing rates of compensation or commissions to solicit-
ors, which last it is unnecessary to refer to, as the rate claimed

by appellee, viz: 50 per cent of the first or cash premium, dose not exceed that fixed by the table of rates in the contract.· The contract between appellant and appellee seems to be the usual form of contract between appellant and its canvassers or solicitors.

It is not controverted that the Mutual Life Company and appellant knew that appellee executed the contract for the sole purpose of procuring an application from Mr. Braun to appellant for life insurance, and that he would still remain in the service of the Mutual Life Company. July 17, 1902, the next day after the execution of the contract above mentioned, Mr. Braun, through appellee, made application to appellant for a $100,000 fifteen-year accumulation policy. No policy was ever issued by appellant to Mr. Braun in accordance with the terms of this application. Appellee executed the following on the day of its date: '

"Chicago, Ill., October 11, 1902.
New York Life Ins. Co.,
    New York, N. Y.
Gentlemen: Referring to the agreement that has been in existence between your company and myself, I wish to avail myself of the clause which gives me the privilege of terminating such agreement. Please have same take effect immediately. Please construe this as my resignation.
                        Yours truly,
                            C. W. Rilling."

There is a conflict in the evidence as to the circumstances under which this document was signed by appellee. After Rilling sent to appellant Mr. Braun's application for a $100,000 policy, appellant, as appears by appellee's testimony, made a counter proposal to issue to Mr. Braun a ten-year endowment policy for $10,000. Mr. Pearman testified that October 11, 1902, he sent for Rilling to come to his office, which he did, and he asked Rilling if he was through trying to get Mr. Braun to go to New York, and through with the effort to get Mr. Braun to accept the offer the New York

Life had made. "He said he was, and I said that my purpose in having him come to the office was to fully protect him, and that if he was ever going to do anything with the Braun case, to do it then, and if he was going to give up and abandon the case and not do any work for the New York Life, I would suggest that he should not incumber its books by being carried as an agent, and he said: 'I am absolutely through, Dr. Pearman, and I think myself it is best to resign.' His resignation was then made up and he signed it."

L. A. Greenwood testified that in 1902 he was the assistant of Dr. Pearman, in appellant's branch office in Chicago; that about two months after the Braun application was in he met Rilling and asked him what he was going to do about the Braun matter, and he said he didn't believe he would do anything about it; that shortly thereafter he again met him and told him they were anxious to know what he was going to do about the Braun case, and took him to Pearman's office, and there heard a conversation between Pearman and appellee; that Pearman told appellee that if he was going to do anything more about the Braun case, he must do it right away, and Rilling said he would not attempt to deliver the proposition which had been made by the New York Life, and Pearman said that if he would not make any effort to deliver the proposition, he should resign and leave way for some other man, that the business had been hanging fire for some time, that the New York Life had other agents in touch with Mr. Braun, and that if Rilling was not going to do anything more, he should step out of the way and let a man step in who would handle it. "Rilling, I believe, said that nobody could write Mr. Braun for insurance, that he controlled the business. The resignation was signed that day in my presence." Witness also testified that in the interview between Pearman and appellee there was nothing in the conversation about reservation of the Braun matter. Rilling, the appellee, testified, in respect to the conversation at the time he signed the resignation, that Pearman told him the appellant had offered Braun a ten-year endowment policy for $10,000, which was its best offer, and that if he could get Braun to

go to New York, or hold him till the chief medical examiner could come to Chicago, they had a good chance to get the policy appellee wanted, and that when Pearman asked him to resign, he told him he would so far as the contract went, but would not relinquish his rights to the Braun claim, and Pearman said it would not affect his claim for commissions, and also said that as soon as appellant could get its chief medical examiner to Chicago he would notify appellee, and he was to bring Braun to the office for exaination, and that he did not tell appellee that if he was going to do anything about the Braun policy he should do it then.

Pearman testified that he had no further dealings with appellee after October 11, 1902; that he remained in the performance of the duties of his office in Chicago until about May 7, 1903, when he ceased to be connected with that office, and May 20, 1903, he sailed from New York for Europe. Pearman also testified that prior to the interview of October 11, 1902, he told Rilling that he had been to New York, and had tried to get appellant to issue a policy on Braun's application and was unsuccessful; that he had talked with appellant's vice-president and that there was a very marked prejudice against the case, by reason of the Mutual Life's rejection of Braun's application, and that the obstacle seemed to be that the company was not clear as to why Braun should have gone to Europe, taking a physician with him, and that he did not see how that could be overcome, and that Braun might go to New York and submit himself to the company's medical examiner there; and Rilling said he would make an effort to get Braun to go; that in three or four days after the last-mentioned conversation he again saw Rilling, and Rilling said that Braun would take no insurance other than that applied for, and that there was no use trying to get him to do so.

July 21, 1903, Braun made four written applications to appellant for four installment annuity policies of insurance on his life; one for $20,000, payable on his death to his son, George P. Braun, Jr.; one for $80,000, payable on his death to his wife, Martha E. Braun: one for $40,000, payable to

his said wife, and one for $60,000, payable to his daughter, Mabel Braun. The applications are signed, "George P. Braun" and are "Witnessed by W. Edwin Nichols, agent." Policies were issued to Braun on the four applications, for the amounts, and for the benefit of the persons,, respectively, mentioned in the applications as beneficiaries. The numbers of the policies correspond with the numbers of the applications, and run from July 21, 1903, the date of the applications. Mr. Braun paid the first year's premium on all the policies, amounting in all to $10,870. Appellee claimed 50 per cent of said amount as commissions.

O'BRYAN & MARSHALL, for appellant.

NEWMAN, NORTHRUP, LEVINSON & BECKER, and C. E. CLEVELAND, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellant's counsel contend that appellee's resignation, meaning the document executed by appellee October 11, 1902, is conclusive against any recovery by appellee. Clause 18 of the contract between appellant and appellee, of date July 16, 1892, provides that "either party hereto may terminate this agreement upon thirty days' notice." It is not questioned that appellee voluntarily executed the so-called resignation, and that appellant accepted it. The language of the resignation is, "Referring to the agreement that has been in existence between your company and myself, I wish to avail myself of the clause which gives me the privilege of terminating such agreement. Please have this take effect immediately." Plainly, the execution of this paper by appellee at once terminated his contract of agency with the appellant, and he was no longer appellant's agent for any purpose. He had no authority after October 11, 1902, to solicit or accept applications to appellant for insurance. This, however, is not conclusive of the question, whether if the company subsequently insured Mr. Braun, and such insurance was wholly or partly owing to appellee's services performed prior to ᵂ. ermination of the contract, he is or not

entitled to compensation for such services. Appellee was employed by appellant solely because of his acquaintance with Mr. Braun, and his supposed influence with him, and because of the fact that he had been acting for Mr. Braun, in endeavoring to procure insurance on his life for the sum of $100,000. He procured Mr. Braun to apply to appellant for insurance to the amount of $100,000, and Braun, as is evidenced by his payment of the sum of $10,870, the total of the first or cash premiums on the four policies subsequently issued to him, was able and willing to accept insurance to the amount of $100,000, and pay the premiums on the same. We think, therefore, the questions whether the services performed by appellee, prior to the termination of his contract of agency, contributed in any degree to the subsequent insurance of Mr. Braun's life by appellant, and, if so, to what amount he is entitled as compensation for such services, were questions for the jury on the evidence. There is not a particle of evidence that appellee procured or had anything to do with the application of Mr. Braun for the four policies issued July 21, 1903, aggregating $200,000 of insurance, and such evidence was not to be expected, because, as heretofore stated, appellee, after October 11, 1902, was no longer an agent of appellant to solicit insurance. Appellee, in his testimony, did not claim that after October 11, 1902, he made any effort to procure insurance from appellant on Mr. Braun's life. Mr. Braun testified that he signed the applications for the four policies by the request of Mr. Edwin Nichols, and that he never spoke to appellee about his, Braun's, talks with Nichols; that he had quite a number of conversations with Nichols on the subject, and that Nichols made an appointment with him in the office of the New York Life, in Chicago, and he, Braun, went over there and saw appellant's physician; that while he was making visits to appellant's office from time to time during three months, and up to the time he received the policies, he did not mention to appellee that he was having negotiations with appellant, and that, as far as he knew, appellee knew nothing of such negotiations. The application for $100,000 insurance, procured

by appellee, was made July 17, 1902, and the applications for the four policies, aggregating $200,000 insurance, are dated July 21, 1903. It is very evident that appellee did not influence Mr. Braun to apply for insurance in double the amount which he first applied for. The question therefore is, what his compensation should be, if anything. The declaration contains six special counts and the common counts, and in each special count it is averred that appellee procured Braun to apply to appellant for $100,000 insurance on his life, and that appellant insured his life in the sum of $100,000, and commissions on the cash and deferred premiums are claimed in the declaration; but on the trial appellee withdrew his claim for commissions on the deferred premiums, and stated, as his only claim, 50 per cent on the first premium, and the jury estimated appellee's compensation at 50 per cent of $10,870, or $5,435 and interest, and on remittitur of $22.65 interest judgment was rendered for $5,684.10. Appellee's counsel, in their argument, claim 50 per cent of $10,870, the total first premiums on the four policies. This claim can only be made on the hypothesis that Braun's application for $200,000 insurance was induced solely by appellee. It certainly was not induced by appellee prior to the termination of his contract of agency, and we think it equally clear from the evidence that it was not induced by him after such termination, when he was no longer the agent of appellant, and had no authority to act in its behalf. In Leviness v. Kaplan (Md. Ct. of Appeals), 59 Atlantic Rep. 127, Leviness was the general agent of the Bankers' Life Insurance Company, and employed Kaplan as a solicitor of insurance, and in November, 1900, Kaplan procured a Mr. Middendorf to apply to the Bankers' Ins. Co. for insurance to the amount of $10,000. The application was postponed for six months by the medical director of the company, during which time nothing could be done either by the insurance company or Kaplan. In November, 1901, Mr. Middendorf met Charles F. Leviness, Jr., who was the son of the appellant and also an agent of the insurance company, and said to him that he had had some dealings with the insurance company, but

the company refused to accept him at the time, and that he would be glad to go ahead with the matter if it were then practicable and possible. Young Leviness then questioned him about his health, and the result was that Mr. Middendorf made a new application for a policy for $20,000, which the company accepted. The suit was against the elder Leviness for commissions on the $20,000 insurance, and he requested the trial court, sitting as a jury, to accept the following proposition, which the court refused: "That if the court does find for the plaintiff, that its verdict cannot be for the amount in excess of the commissions claimed on $10,000, as to that item of the plaintiff's suit, and not upon the second $10,000, if the court should believe that the plaintiff procured an application for $10,000, and that the defendant, through another agent, procured the second $10,000." The Court of Appeals, after discussing some questions, among which was the question whether the evidence tended to prove abandonment by Kaplan, say: "Even if the two questions above referred to be decided in favor of the appellee, he should not be allowed to recover commissions on more than the $10,000 for which the original application was filed. The evidence shows that the application for $20,000 was made at the suggestion of young Leviness. The testimony of the appellee is to the effect that he expressly limited the one he got to $10,-000. He said: 'It was policy to do it, although the fact seems to be that there was then that limit by the company.' But if there be no limit, then, according to the appellee's contention, if the policy had been issued for $10,000, and young Leviness or some other agent had afterwards induced Mr. Middendorf to take another policy, the appellee was then entitled to commissions on the ground that his work was 'the procuring cause leading to' the second application. We have been referred to very few authorities on the subject, but in 16 Am. & Eng. Ency. of Law, 911, it is said: 'Where an agent of an insurance company, employed on a commission basis, procures an application for insurance, and subsequently another agent of the company induces the applicant to increase the amount of the application, the former agent is not

12

entitled to his commission on the additional insurance thus
secured.' Citing Brackett v. Met. Ins. Co., 18 Misc. Rep.
(N. Y.), 239, 41 N. Y. Supp. 375. The principle thus
stated seems to us to be just and eminently proper, and in
this case, where the first application entirely failed, and a
year after the first was filed a new application for double the
amount was made, and accepted through another agent, there
is still more reason for the application of the principle. If
the appellee be entitled to recover at all, his recovery should
therefore be limited to commissions on the amount of the
original application."

See, also, Brackett v. Met. Ins. Co., 41 N. Y. Supp. 375,
cited by the court in the last case, which is directly in point,
with the exception that the plaintiff in the case was still an
agent of the company when the second application was made,
while appellee was not.

Appellee's counsel base his claim for compensation on
clause 20 of the contract of agency, which provides: "It is
agreed that said party of the second part shall be allowed,
under this agreement, the following compensation only, un-
less otherwise expressly stipulated in writing, namely, a com-
mission on the original cash premiums for the first year of
insurance, and, subject to conditions given in paragraph C
of this section, upon the second premiums, which shall, dur-
ing his continuance as said agent of said party of the first
part, be obtained, collected, paid to and received by said
party of the first part, on policies of insurance effected with
said party of the first part (written with 15, 20, 25 or 30
year accumulative periods) by or through said party of the
second part," etc. How can it be said that the policies for
$200,000 were exclusively effected with appellant by or
through appellee, in the face of the fact that he knew nothing
of the negotiations between Braun and appellant for the
$200,000 policies left after the policies were issued? In
passing, we may say that we do not concur in the construc-
tion of appellant's counsel, that the words of the clause in
question—"which shall, during his continuance as said agent,
be obtained," etc.—include first year or cash premiums. Our

construction is, that these words apply solely to the deferred premiums. By clause 15 of the written contract it is provided: "That in case any special agents, or other parties acting for said party of the first part, shall secure any business conjointly with said party of the second part, the commissions herein provided shall be divided equally between the parties to this agreement, unless specifically agreed to the contrary in writing." Appellee's counsel contend that this has no application in the present case, for the reason that appellee and Nichols did not act "conjointly." In the sense that they did not act together at the same time or times, this is true. But the $200,000 policies may have been the result of their combined action, namely, the action of appellee, before he terminated his agency agreement, and the action of Nichols after that time, in which case we think the clause applicable.

But appellee's counsel further contend that the application for a $100,000 insurance was never rejected by appellant, and that the insurance of $200,000 issued on that application. It appears from the testimony of Pearman, Greenwood and Rilling himself, that instead of appellant accepting the $100,000 application, it made a counter proposition, which Rilling testified was to issue to Mr. Braun a $10,000 ten-year endowment policy, Mr. Braun's application having been for a $100,000 15-year accumulation policy, and that he refused to attempt to influence Mr. Braun to accept the offered policy.

The four policies issued were not only for double the amount of insurance, but were entirely different in other respects. But counsel for appellee further contend that the four policies were not issued on the applications for them in evidence, and argues that, therefore, they must have been issued on the original application. This conclusion is a *non-sequitur*, and is apparently recognized so to be by appellee's counsel, who say, in another part of their argument: "The truth is that the application is not of controlling importance; the contract of employment says nothing about applications," etc. The basis of counsel's argument consists of the follow-

ing evidence: The four applications and the four policies are dated July 21, 1903, and at the head of each application are the following words:

> "Application to the New York Life.
> Received July 31, 1903.
> Home Office."

From this counsel argue that the applications appearing to have been received by appellant at the home office, in New York, July 31, 1903, the policies, which are dated July 21, 1903, could not have been issued on the applications. Mr. Braun, in his testimony, is not clear as to the date when he signed the applications. He testified that he signed the applications; that Nichols asked him to come to his office, which he did, and then Nichols took him to another place, across the street from appellant's Chicago office, where there were several physicians to examine, and that this was before they wanted him to go to New York. On being asked whether he signed the four applications on the day of their dates, he answered: "I don't remember," but subsequently said: "Well, the assumption is that I signed at that date," and on being asked whether that was his best recollection, he answered, "Yes." On being further examined, he testified that he signed no paper after he got the policies. We think it evident from the examination of the witness that he could not recollect the date when he signed the applications, and that he was only certain in respect to the signing, and that he signed them before he received the policies. The fact that the applications and policies are of the same date may be merely for convenience and owing to the following in each application: "I agree on behalf of myself    *    *    * that the insurance under any policy issued on this application shall take effect on the date of this application, unless otherwise agreed in writing." We do not think it material whether the applications were received by the appellant at its home office in New York or its branch office in Chicago. That they were signed by appellee before the four policies were delivered, is proved by Mr. Braun's testimony, and that the

policies were issued on the four applications is evidenced by the fact that the applications and the policies substantially correspond.   There was no evidence of the first or cash premium on a policy for $100,000, such as Mr. Braun first applied for.   In a note from Rilling accompanying Braun's first application, this occurs:   "I have made the following settlement of first premium of $7,110," which is the only reference to premium on the first application.   But counsel for appellee elected, on the trial, to estimate appellee's compensation as 50 per cent of the total of first or cash premiums on the policies, namely, $10,870.   On this theory, our conclusion is that his compensation should be 50 per cent of half that amount, or $2,717.50.   There is no evidence of any demand by appellee for compensation, except the commencement of this suit, and there has been no vexatious or unusual delay.   Therefore, appellee is not entitled to recover any interest.

Counsel for appellant objects that the testimony of the witness Carlile as to the conversation between him and Pearman, prior to the execution of the written contract, was incompetent on the ground that it tended to vary the written contract between the parties, and cites authorities in support of the familiar rule that all prior negotiations leading up to the execution of the written contract are merged in the contract.   The rule applies only to negotiations or agreements between the parties prior to or contemporaneous with the written contract, and has no application to conversations between one of the parties and a third person.   That a conversation between Pearman and Mr. Carlile could not possibly vary the terms of the subsequent written contract between appellant and appellee, is, we think, self-evident.

Counsel also objects that the admission in evidence of the four policies of date July 21, 1903, was error.   We think the policies were properly admitted in evidence.

Counsel for appellant asked the witness Pearman the following questions:

"Q. I will ask you to look at the four policies which have been introduced in evidence here, dated July 21, 1903, and

state whether or not you know of your own knowledge whether those policies were issued on the application dated July 17, 1902?

Plaintiff objects; sustained; defendants except.

Q. Up to the time, October 11, 1902, to date of Mr. Rilling's resignation, did you ever receive a policy for $100,000, fifteen-pay life, on the life of Mr. George P. Braun for delivery?

Plaintiff objects; sustained; defendants except.

Q. What, if anything, did you receive from the company on that application?"

The first question was properly ruled against. The policies and applications were in evidence, and, by inspection and comparison of these, it could be determined whether the policies were issued on the applications. The ruling against the second and third questions could not, as we think, have prejudiced appellant. The testimony of Pearman and Rilling was to the effect that the only answer to the application of July 17, 1902, was a counter proposal by appellant to issue a policy different from that applied for, and the only contention by appellee's counsel, in respect to the issuing of a policy on that application, is that the four policies were issued on it. Appellant's counsel asked the witness Braun questions as to whether appellee ever procured for him a policy from appellant, on his application signed in May, 1902; whether Rilling ever presented him to the Equitable Life Insurance Company for a policy; whether he was not presented to said company for a $100,000 policy in April, 1903, etc., and offered to prove that witness, at Rilling's request, submitted himself to said company for an examination for life insurance after October 11, 1902. The court ruled against the questions and offer, correctly, as we think. The questions were asked in support of the theory of counsel, that Rilling's resignation is to be construed as an abandonment of compensation for services rendered before his resignation, even though it should appear that such services contributed to the subsequent insurance effected by the four policies, a construction in which we cannot concur. We con-

cur in appellant's contention, that the damages are excessive.

Counsel for appellant complains of certain remarks of appellee's counsel on the trial. We will consider only such remarks as exceptions were preserved to and rulings made. The witness Pearman testified that he did not remember having seen Mr. Braun in appellant's office subsequent to January, 1903. Mr. Levinson, appellee's attorney, said: "Yes; you don't remember now." Witness: "Is there no way that I can be protected from this man stating things to me in court, that he would not state to me out of court?" Mr. Levison: "When a man comes to your Honor, and says that he did not know and does not know anything about it, when he was there when this man was examined, and now he dodges about, and says, 'I don't remember.' He knows he was there." On appellant's counsel excepting, the court said: "Yes, I think it is very objectionable to state, as a fact, that which the witness has testified was not a fact." The witness was subsequently recalled, and testified that he did then remember, when the following occurred: Mr. Levison: "Now he remembers again. He has been talking with somebody." Witness: "Mr. Levison, I said on oath that I hadn't been talking." Mr. Levison: "I don't think that an oath amounts to anything with you." On exception the court said: "I cannot see any reason for making any such statement, in regard to any witness in this case. There is nothing in this case to give the court any reason for making such a statement to these witnesses." We agree with appellant's counsel that the last-mentioned remark to the witness was very improper, and that the court might well have severely censured its author, but, in view of the court's rulings, we are not inclined to hold the remarks of counsel cause for reversal. The court instructed the jury to disregard all statements and remarks of counsel not based on the evidence.

Counsel for appellant objects that appellee had no license to carry on business as a broker. It is sufficient to say of this objection, that appellee's business was not that of a broker, that he acted merely as an insurance solicitor.

Lastly, appellant's counsel objects to certain instructions given and to the refusal of others.

Counsel say the fundamental error in the instructions given is that they permitted the jury to consider the oral evidence offered to vary the terms of appellee's contract of agency. There was no evidence which so tended. Instructions B and S, given by the court of its own motion, are favorable to the appellant in that they authorize the jury to find for the defendant, if they found from the evidence that appellee abandoned his contract. We have already shown that appellee's so-called resignation was merely a termination of his agency, and not an abandonment of any claim he might have on account of past services. Instruction B, however, is erroneous in that it authorized the jury, in the event they should find for appellee, to estimate the commissions due him on the total of the first premiums on the four policies. We think there was no error in the refusal of appellant's instruction 4. It applied only to one witness, Pearman.

Appellant's refused instruction 9 is substantially included in its given instruction 13. When the court had concluded the reading of instructions to the jury, a juror asked this question: "In bringing in our verdict, must we bring in a verdict for a definite sum, if we bring in a verdict for the plaintiff?" Whereupon it was agreed by the parties that the court might give a further instruction to the jury orally, and the court orally instructed the jury thus: "If your verdict should be for the plaintiff, which neither yourselves nor the court, at this time, undertake to express an opinion about, you would find a verdict for a definite amount, being a percentage on the premium which the evidence shows to have been paid." The only evidence of premiums paid was as to the premiums on the four policies aggregating $10,870, and the only claim as to percentage made by appellee, as stated by his counsel on the trial, was 50 per cent of the first or cash premium. The instruction, therefore, could not have been otherwise understood by the jury, than that if they found for the plaintiff they were to estimate his commissions

at 50 per cent of $10,870. The instruction is misleading and erroneous. The verdict of the jury, although excessive, is, in so far as it finds appellee entitled to commissions, warranted by the evidence, and is not manifestly contrary to the weight of the evidence. We do not find in the record any evidence of partiality, prejudice or passion on the part of the jury. The estimating appellee's commissions .at 50 per cent of $10,870 was a mistake, probably induced by the oral instruction of the court, which we think curable by *remittitur*. Upon appellee filing a *remittitur*, within ten days from this date, of the sum of $2,966.60, the judgment will be affirmed for the sum of $2,717.50; otherwise the judgment will be reversed and the cause remanded for further proceedings in conformity with this opinion.

*Affirmed on remittitur; otherwise to be reversed and remanded.*

Remittitur filed in accordance with opinion and judgment affirmed for $2,717.50, June 19, 1905.